# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 24, 2017.
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2015-SC-000384-DG

UNIVERSITY OF KENTUCKY, JOSEPH         APPELLANTS
MONROE, AND KENNETH CLEVIDENCE

ON REVIEW FROM COURT OF APPEALS
V.      CASE NO. 2012-CA-000994 AND 2012-CA-001429
FAYETTE CIRCUIT COURT NO. 2007-CI-04844

BOBBYE CARPENTER, TIUA CHILTON,        APPELLEES
AND LAURA MARCO

## MEMORANDUM OPINION OF THE COURT

### REVERSING

Female employees of the University of Kentucky Police Department sued the University, its police chief, Joseph Monroe, and its former director of public safety, Kenneth Clevidence, claiming to be victims of gender discrimination and retaliation. We granted discretionary review to address whether the Court of Appeals properly reversed the circuit court's grant of a directed verdict against one of the employees, Bobbye Carpenter, on her discrimination and retaliation claims, a summary judgment against another employee, Laura Marco, on her discrimination claim, and a summary judgment against a third employee, Tiua Chilton, on her discrimination and retaliation claims. Having determined that

the Court of Appeals erred in its opinion, we reverse the Court of Appeals opinion and reinstate the judgments of the trial court.

## I. PROCEDURAL BACKGROUND.

A total of seven female members of the University of Kentucky's campus police department filed a joint complaint in circuit court against the University, Clevidence, and Monroe in which they alleged gender discrimination, retaliation, and violation of the Kentucky Whistleblower Act. All plaintiffs alleged in some form that Clevidence and Monroe engaged in or tolerated a pattern of discriminatory behavior. Some plaintiffs also alleged retaliation after they made complaints of gender discrimination to the University's Office of Institutional Equity and Equal Office.

When discovery was completed, the University, Clevidence, and Monroe moved for summary judgment on all claims, which the trial court denied. They later asked the trial court to separate the plaintiffs' claims for trial, and the trial court denied that motion. Following the United States Supreme Court's opinion in *Wal-Mart v. Dukes*,[1] the trial court ruled that the plaintiffs' claims would be tried separately. *Dukes* was a United States Supreme Court case in which the Court held that plaintiffs pleading a pattern of discrimination is not sufficient for class certification.[2] The Supreme Court in *Dukes* held that class certification required that the class members have suffered the "same injury," not simply all suffering under the same provision of the law.[3] Applying this

---

[1] *Wal-Mart v. Dukes*, 564 U.S. 338 (2011).

[2] *Id.* at 352.

[3] *Id.*

logic to the facts of the present case, the trial court reversed its position and ordered separate trials.

Carpenter's case was the first one to be presented in a jury trial. Before trial, the trial court set parameters on the scope of trial testimony allowable from the other plaintiffs. The trial court ruled that their testimony in Carpenter's trial must be confined to evidence of discrimination that: (1) resulted from decisions made by the same supervisors who had allegedly discriminated against Carpenter; and (2) occurred contemporaneously with Carpenter's alleged discrimination.

After Carpenter presented all her evidence at trial, the trial court granted the defendants' motion for a directed verdict on all of her claims. Following the dismissal of Carpenter's case, the trial court reconsidered the defendants' summary judgment motions and dismissed the claims of all remaining plaintiffs.

Carpenter and five of the plaintiffs appealed the trial court's dispositive judgments. The Court of Appeals reversed the directed verdict against Carpenter and the summary judgments against Chilton and Marco.[4] The panel affirmed the dismissals of the remaining plaintiffs and reversed the trial court's pretrial ruling separating the cases for trial, remanding for a possible joint trial of the claims of Carpenter, Chilton, and Marco. We granted the motion for discretionary review by the University, Monroe, and Clevidence.

---

[4] The Court of Appeals found that Marco's retaliation claim was properly dismissed on summary judgment.

3

## II. ANALYSIS.

### A. Standards of Review.

Our analysis requires us to review the propriety of the trial court's disposition of claims by two different procedural devices–Carpenter's claims by directed verdict and Chilton's and Marco's claims by summary judgment.

A trial court deciding a motion for directed verdict must draw all fair and reasonable inferences from the evidence presented at trial in favor of the party opposing the motion. And on appeal from the trial court's grant of a motion for directed verdict, we "must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party."[5] After having the evidence presented to the trial court, who fairly considered the evidence, "a reviewing court cannot substitute its judgment for that of the trial judge unless the trial judge is clearly erroneous."[6] When reviewing summary judgment, we must ask whether the trial court properly found that there was no genuine issue of material fact and properly applied the law.[7]

### B. Legal Elements Required for Plaintiffs' Claims.

As we review the trial court's decision to grant the motion for directed verdict and summary judgment, we first examine the elements necessary to prove a prima facie case for the asserted claims.

#### 1. Elements Required for Gender Discrimination and Hostile Work Environment.

The Kentucky Civil Rights Act (KCRA) is similar to the Federal Civil Rights Act of 1964, and our interpretation of the Kentucky statute generally tracks

---

[5] *Bierman v. Klapeke*, 967 S.W.2d 16, 18 (Ky. 1998).

[6] *Id. (citing Davis v. Graviss*, 672 S.W.2d 928 (Ky.1984)).

[7] *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010).

4

federal case law.[8] Under the KCRA, it is an unlawful employment practice to "fail or refuse to hire, or to discharge any individual, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges because of an individual's sex."[9]

In *Commonwealth v. Solly,* we adopted the *McDonnell Douglas Corporation v. Green* test for state civil rights claims for gender discrimination.[10] Under this framework, a prima facie case requires proof that: (1) plaintiff was a member of a protected group; (2) plaintiff was subjected to an adverse employment action; (3) plaintiff was qualified for the position; and (4) similarly situated persons of the non-protected group were treated more favorably.[11] If a plaintiff can maintain a prima facie claim, the burden shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for the alleged discriminatory actions.[12] If the defendant can do so, the burden then shifts again, and the plaintiff must show that the reasons given for the alleged discriminatory actions were not "pretext" for discrimination.[13]

To qualify a similarly situated person, the person "must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or

---

[8] *Ammerman v. Board of Education, of Nicholas County,* 30 S.W.3d 793, 797-98 (Ky. 2000).

[9] KRS 344.040(1).

[10] *Commonwealth v. Solly,* 253 S.W.3d 537 (Ky. 2008); *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973).

[11] *Solly,* 253 S.W.3d at 541.

[12] *Id.*

[13] *Id.*

mitigating circumstances that would distinguish their conduct or the appropriate discipline for it."[14] Examples of adverse employment action can include: a demotion, a less distinguished title, a material loss of benefits, or a significantly diminished material responsibility.

In *Ammerman v. Board of Education of Nicholas County*, we articulated the elements required to assert a prima facie case for a hostile-work-environment claim.[15] A hostile-work-environment claim exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[16] The alleged "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."[17]

## 2. *Retaliation Claim.*

A KCRA claim for unlawful retaliation falls under KRS 344.280(1). To make a prima facie case for retaliation, a plaintiff must establish (1) she was engaged in a protected activity; (2) she was disadvantaged by an act of her employer; and (3) there was a causal connection between the activity engaged in and the employer's treatment of her.[18] If the plaintiff is able to put forth a prima facie

---

[14] *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y. 1986).

[15] *Ammerman v. Board of Education of Nicholas County*, 30 S.W.3d 793 (Ky. 2000).

[16] *Id.* (quoting *Williams v. General Motors Corporation*, 187 F.3d 553, 560 (6th Cir. 1999).

[17] *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir. 1989).

[18] *Banker v. University of Louisville Athletic Association, Inc.*, 466 S.W.3d 456, 460 (Ky. 2015).

case, the defendant may rebut the allegation by providing a legitimate, non-discriminatory reason for the employer's actions.[19]

### 3. *Whistleblower Claim.*

The Kentucky legislature has created a statutory shelter for individuals who choose to speak out about government misbehavior. Similar to a KCRA retaliation claim, this statute is intended to provide recourse when an employer takes action to punish an individual for speaking out.[20] The legislature provides this shelter in KRS 61.102, or commonly known as the Kentucky Whistleblower Act.

To prevail on a claim under the Whistleblower Act, a plaintiff must establish all of the following four elements: "(1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure."[21]

---

[19] *Id.* at 462.

[20] Without acknowledging our holding in *Cabinet for Families and Children v. Cummings*, 276 S.W.3d 789, 792 (Ky. 2008), the Court of Appeals held that Monroe and Clevidence could be held personally liable as employers under KRS 61.102, which is contrary to our holding in that case. The disposition of the case before the Court today does not require us to revisit our holding in *Cummings*, accordingly, we will not do so.

[21] *Gateway Area Development District, Incorporated v. Cope*, 2015 WL 602726 (Ky. App. 2015) (*citing Davidson v. Commonwealth, Department of Military Affairs*, 152 S.W.3d 247, 255 (Ky. App. 2014)).

## C. The Trial Court's Disposition of Carpenter's, Chilton's, and Marco's Claims Was Not Erroneous.

The Court of Appeals panel reversed the trial court's judgments in favor of the defendants for all claims asserted by Carpenter, Chilton, and Marco. In reviewing the record, we cannot say that the trial court erred in its rulings.

### 1. Marco.

Marco was employed at UKPD for approximately two years. She testified that Monroe had asked her out on dates on several occasions soon after her employment at UKPD began. She declined all of these invitations. While Marco testified that she was not sexually harassed by Monroe, with regard to the romantic overtures she stated, "it was just kind of odd how he was so nice to me and then so not nice to me." Marco further asserted that she was supervised more closely than other officers, denied backup, denied requested schedule changes, denied a requested course certification, and disproportionally disciplined. The trial court found Marco failed to present a sufficient factual basis to support any of these allegations, and the Court of Appeals reversed this ruling.

We believe the trial court was correct in its analysis. The Court of Appeals reasoned that when considered as a whole, Marco's claims state a prima facie case for gender discrimination. And the Court of Appeals also held that Marco sufficiently had set out a hostile-work-environment claim. Specifically, the Court of Appeals found that Marco had sufficiently put forth enough evidence to refute UKPD's explanations of their actions, finding that UKPD's stated reasons were pretextual in nature.

8

We begin with the appellate panel's holding that Marco had sufficiently stated a hostile-work-environment claim. A claim for "hostile work environment discrimination must show that the alleged behavior [is sufficiently] severe or pervasive...."[22] The alleged conduct must be of such a magnitude that it alters the terms and conditions of employment.[23] In its analysis, the Court of Appeals panel cites the "overall circumstances" of Marco's employment in conjunction with isolated incidents of male officers allegedly discussing strip-clubs and viewing pornography on work computers. While these incidents are examples of unacceptable conduct in the workplace, Marco provided no evidence that this conduct was pervasive conduct and so as to alter the terms of her employment.

We are also unable to find that the trial court erred by failing to recognize a viable claim for disparate treatment. Marco claims rumors circulated in the office that she performed sexual acts in her police cruiser. She alleges that these rumors were not only embarrassing but resulted in her conduct being monitored more closely than conduct of other officers. Marco testified that after complaining about the rumors to co-workers, the frequency with which she was monitored diminished and eventually the rumors subsided. Though she was monitored less, Marco believed that as a consequence of her reporting the rumors that her fellow officers failed to provide her with backup. But she never reported a single instance of a failure by fellow officers to provide backup, and she offered no evidence that any alleged failure to provide backup was connected to her gender.

---

[22] *Lumpkins ex rel. Lumpkins v. City of Louisville*, 157 S.W3d 601, 605 (Ky. 2005).

[23] *Ammerman*, 30 S.W.3d at 798.

9

Marco further claimed she was denied a shift-change request after she had been on the job for about a year. She was working the third shift when she requested authorization to work a home football game in order to draw enhanced pay for the overtime hours. It was UKPD custom that officers who work the third shift generally do not work football games. While the denial of the request to work the football game may have frustrated Marco, we cannot find that the trial court erred when it failed to recognize this as grounds for a gender-discrimination claim. It is important to note the fact that around the same time Marco made her request, another female officer, Andrea Eilertson, was approved for a factually similar shift change, damaging Marco's claim she was denied the shift change because of her gender.

## 2. Chilton.

The trial court ruled that Chilton failed to assert a prima facie case for gender discrimination, and the Court of Appeals panel reversed that ruling. After review of the record we find that the trial court did not err in granting summary judgment in favor of the defendants on this claim.

The Court of Appeals panel focused on Chilton's schedule change. While on pregnancy leave, she was switched from first to second shift. Chilton was thereafter replaced on first shift by a male officer with less seniority. UKPD recognized that this type of shift change was not standard. Typically the officer with more seniority is given preference when scheduling shifts. UKPD asserts by way of explanation that Chilton's shift changes was made in conjunction with department-wide shift changes made at the time.

UKPD emphasized that Chilton was needed on second shift because of her leadership experience and the additional oversight her superior experience

10

provided to less experienced second-shift officers. Lastly, the male officer who replaced Chilton on first shift was a motorcycle officer, a particular skill that was needed at the time on the first shift. We are not only convinced that UKPD sufficiently rebutted Chilton's shift change as not being pretextual but the employee-skill and training differential between Chilton and the male officer who replaced her on first shift refutes the argument that the two officers were similarly situated employees.

The Court of Appeals panel held that Chilton's shift change alone raises a prima facie case for gender discrimination. The panel reasoned that because Chilton's shift change was a departure from the customary seniority-preference protocol, it created a genuine issue of material fact supporting an inference of pretext. We do not disagree that a departure from protocol can be evidence of pretext, but it is a rebuttable fact. UKPD put forth sufficient evidence in rebuttal to satisfy us that the trial court did not err in granting summary judgment on Chilton's claim.

The Court of Appeals also noted Chilton's alleged receipt of unsolicited mail that included a Playboy magazine. While not clear from the record and not discussed by the trial court, the Court of Appeals panel cited what they interpreted to be sex-related tourism mail. This kind of behavior can be a factor in proving a hostile-work-environment claim but is not in itself sufficient. Even in conjunction with Chilton's other alleged grievances, we believe the trial court, having reviewed the evidence, properly granted summary judgment in favor of the defendants.

In its opinion, the Court of Appeals panel concludes that the trial court erred in granting summary judgment on Chilton's retaliation claims. In its

11

analysis, the panel simply states, "...Chilton presented evidence that her responsibilities were downgraded and her command authority was undermined after that meeting [referencing her private meeting with President Todd concerning the potential hiring of Monroe as police chief]." The Court of Appeals follows that sentence by acknowledging that the evidence presented for the retaliation claim was weak.

After reviewing the record and considering the appellate panel's analysis, we are unconvinced that the trial court erred on this point. There is no evidence that any of the defendants knew about the meeting between Chilton and President Todd. President Todd testified at trial that he never discussed the meeting with anyone and that neither Monroe nor Clevidence would have known about Chilton's concerns. This fact of nondisclosure is fatal to the claim of retaliation. Without linking any alleged negative treatment to the revelations allegedly made by Chilton to President Todd, Chilton's retaliation claim must fail. Accordingly, we hold that the trial court did not err in granting summary judgment.

### 3. Carpenter.

The trial court dismissed Carpenter's claims by directed verdict on motion of the defendants after she had presented her case to the jury at trial. The appellate panel reversed the directed verdict, an action that requires a finding by the appellate court that the trial court's directed-verdict ruling was clearly erroneous.[24]

---

[24] *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky. 1998).

The appellate panel's premise for reversing the directed verdict was simply that the trial court improperly denied joinder and separated the plaintiffs' cases for trial. In its opinion, the Court of Appeals stated that "A determination on a question of joinder is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion." While the trial court may have misread the holding in *Dukes*, we are unwilling to say that the trial court abused its discretion by ordering separate trials. Weighing the evidence and relevant case law, the trial court cited that the plaintiffs in the case had different positions within the department, had worked at different periods of time, had different commanding officers, possessed varying levels of experience, and experienced a variety of education levels. Further, the trial court was not convinced that the claims presented by the various plaintiffs were sufficient to show a "pattern or practice" within the department that discriminated against women, which would bolster the argument for the joinder of the claims. We cannot say the trial court abused its discretion in its analysis.

As the appellate panel recognized, "If the trial court properly granted summary judgment on their claims, then the court's denial of the joinder motion is moot. Likewise, we would then consider the directed verdict on Carpenter's claims without reference to the dismissed claims." Having reached that conclusion, the trial court did not err by granting summary judgment on Marco's and Chilton's claims. We must review Carpenter's claims individually and not as a collective with the others. And we must do so with a light touch, remembering that the trial court heard the evidence and observed the

13

witnesses at trial, and we are to not disturb the directed verdict unless it is clearly erroneous.[25]

Carpenter's main argument for error in granting the defendants' directed verdict is that the trial court abused its discretion in several evidentiary rulings. She argues that the trial court's order restricting the testimony of other female employees was too narrow. But, after review of the trial court order and the entire record, we cannot agree.

During a pre-trial conference, the trial court ruled that the other female employees could testify at trial about their own alleged mistreatment at UKPD to the extent that the subject of the testimony covered "disparate treatment which resulted from decisions by the same supervisors or decision makers and during the same time frame that Bobbye Carpenter claims she was subjected to disparate treatment." The trial court granted the defendants' motion to restrict the testimony from the other female employees "regarding decisions which were made by different decision makers during a different timeframe than the disparate treatment evidence offered by Bobbye Carpenter."

We are satisfied from our review of the record that the trial court did not abuse its discretion by restricting the other female employees' testimony. The trial court confined the range of testimony by other employees to their individual perceptions of disparate treatment so long as the testimony involved the same decision makers during the relevant period of time. Otherwise, the

---

[25] *Id.*

14

testimony would have been irrelevant to Carpenter's claim, being more prejudicial than probative, and a violation of KRE 404(b).[26]

Carpenter's individual claims vary but do not appear to us to be sufficient for a disparate-treatment claim. While Carpenter never applied to be the UKPD chief, it is apparent that she was frustrated that she was not put in charge of the department on occasions when the chief was absent. Instead, on those occasions, commanders Paul Grant and Kevin Franklin were put in charge. But when she asked the chief about this perceived slight, he explained that at least one of the two commanders had more experience in the operation of a police department. The fact that Carpenter was not asked to take charge in the chief's absence is not alleged to have actually diminished any of her regular duties. And she failed to produce evidence to suggest that she should rightfully have been left to run the department when the chief was away.

Carpenter's duties did vary from her customary role from 2003 to 2004. During this period, Carpenter performed the duties of a budget officer after the former budget officer resigned that position. While in this temporary position, Carpenter's duties were so extensive that she was kept from performing the customary duties of a police officer. But after serving in this role on an interim basis, she returned to her former position, and she concedes that her "material responsibilities were restored."

Lastly, while working at UKPD, Carpenter was granted promotions over her male colleagues, she was never denied a promotion while Clevidence was the

---

[26] Kentucky Rules of Evidence 404(b).

15

Director of Public Safety, and when she returned to work from maternity leave she assumed her regular duties as they were before taking leave.

Carpenter also asserts a retaliation claim under the Whistleblower Act and KRS 344.280. When granting the directed verdict, the trial court cited evidence that neither Monroe nor Clevidence was Carpenter's employer under the statutes. We need not address the wisdom of the trial court's reasoning, but we are satisfied nonetheless that Carpenter did not prove a prima facie retaliation claim. Review of the record does not support reversing the trial court as clearly erroneous. Furthermore, while slightly unclear, it appears that the appeals panel mistakenly attributed Carpenter's meeting with President Todd as supporting proof of her retaliation claim.

The record does not support the appellate panel's holding that the trial court's grant of a directed verdict was clear error. So we reverse.

### III. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and reinstate the dispositions of made by the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANTS:

Barbara Ann Kriz
Kriz, Jenkins, Prewitt & Jones, P.S.C.

William Thro
University of Kentucky

COUNSEL FOR APPELLEES:

Robert Lee Abell